UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

AUGUST FETTING,

           Plaintiff,

           v.                                      Case No. 20-C-1268

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

           Defendant.

---

## DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER

---

Plaintiff August Fetting filed this action for judicial review of a decision by the Commissioner of Social Security denying his application for supplemental security income under Title XVI of the Social Security Act. Fetting contends that the decision of the administrative law judge (ALJ) is flawed and requires reversal for a number of reasons. For the following reasons, the Commissioner's decision will be affirmed.

### BACKGROUND

On February 28, 2018, Fetting filed an application for supplemental security income, alleging disability beginning July 1, 2016. After his application was denied initially and on reconsideration, Fetting filed a written request for a hearing. On December 16, 2019, ALJ Arman Rouf conducted a hearing at which Fetting, who was represented by counsel, and a vocational expert (VE) testified. R. 30–79.

At the time of the hearing, Fetting was 50 years old and lived in a house by himself. R. 36–37. Fetting testified that he completed high school and went to college for trucking. R. 37. He indicated that he had worked for years as a truck driver, driving tractor trailers and completing

mechanic work on the trucks. R. 38–39. He testified that, at his jobs, he would lift 75 pounds. R. 39. Fetting testified about an incident where the tractor trailer he was driving was hit by a vehicle and resulted in the truck jack-knifing. R. 57. He stated that, since the accident, he gets migraines and headaches. *Id.* Fetting then indicated that he worked at a chicken factory in the sanitation department but quit that job because his legs were swollen. R. 42–43.

Fetting testified that his mental conditions and back pain prevented him from working. *Id.* As to his physical conditions, Fetting stated that he has pain that radiates from his neck to his legs. R. 44. He testified that he did not receive treatment for his back pain because he did not "believe in doctors" and did not take medication. R. 45. As to his mental health, Fetting indicated that he gets angry, loses his temper, and has anxiety attacks. R. 46–47. He reported going to counseling once a week. R. 49. In a typical day, Fetting indicated that he takes care of his animals, which include fish, dogs, cats, ducks, geese, and chickens, sits on the couch and goes through the news, visits with his parents for five minutes, paces around the house, eats dinner, and calls his girlfriend. R. 49–50. He testified that he cooks but gets impatient and also cleans his house. R. 50–51. He stated that he never gets a full night of sleep and has issues focusing when he is tired. R. 59. Fetting reported that he gets panic attacks when he drives. R. 66.

In a thirteen-page decision dated March 4, 2020, the ALJ concluded Fetting was not disabled. R. 13–25. Following the Agency's sequential evaluation process, the ALJ found that Fetting has not engaged in substantial gainful activity since February 28, 2018, the application date. R. 15. Next, the ALJ determined that Fetting had the following severe impairments: chronic pain syndrome, headaches, major depressive disorder, persistent depressive disorder, and generalized anxiety disorder. The ALJ indicated that Fetting did not have an impairment or

combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1. *Id.*

The ALJ then determined that Fetting had the residual functional capacity (RFC) to perform light work with the following exceptions:

> the claimant can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl; can frequently reach overhead with the bilateral upper extremities; can tolerate moderate noise in the work environment; can tolerate lighting no brighter than in a typical office environment; must avoid unprotected heights, moving mechanical parts, and operating a motor vehicle; can perform simple and routine tasks; can maintain attention and concentration for two-hour segments; can make simple work-related decisions; can occasionally interact with supervisors and coworkers; and can never interact with the public.

R. 17. The ALJ found that Fetting is unable to perform any past relevant work but, considering Fetting's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform, including cleaner, routing clerk, and marker. R. 23–24. Based on these findings, the ALJ concluded Fetting was not under a disability since February 28, 2018, the date the application was filed. R. 24. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Fetting's request for review. Thereafter, Fetting commenced this action for judicial review.

## LEGAL STANDARD

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the Social Security Administration (SSA) at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense, given the fact that the vast majority of people under

3

retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence cannot distinguish those that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the vast majority of cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his or her conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

5

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006).  Finally, judicial review is limited to the rationales offered by the ALJ.  *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

### A. Evaluation of Medical Opinion Evidence

Fetting asserts that the ALJ failed to properly evaluate the opinions of Dr. Sandra Frodin and Dr. Peggy Dennison.  Under the new regulation governing the assessment of medical opinion evidence, the ALJ focuses on the persuasiveness of the medical opinions by considering the following factors: supportability, consistency, the relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)–(5).  The regulation explains that supportability and consistency are the "most important factors" to consider.  § 404.1520c(b)(2).

Dr. Frodin completed a psychological report on June 28, 2018, after Fetting was referred to her by the Disability Determination Bureau for a mental status examination regarding his anxiety and panic attacks.  R. 287.  Dr. Frodin stated that Fetting has chronic back and neck pain and headaches from a January 7, 2007, semi accident.  R. 290.  She observed that he is uncomfortable sitting and he shifted in his chair and stood during the interview.  She noted that he is symptomatic for depression and anxiety, with very pressured, tangential speech, sleep disruption with racing thoughts, and panic attacks.  Dr. Frodin indicated that Fetting has irritability, crabbiness, a sense of worthlessness and crying spells.  She also noted that Fetting has memory issues as evidenced in only being able to name two of three objects after a five-minute delay, only being able to do digit span forward to four digits and backwards to three digits, and serial 3's from 100 to 80 with three errors.  She indicated that it appeared pain is a distracting factor for Fetting. *Id.*

Dr. Frodin opined that Fetting's ability to understand, remember, and carry out simple instructions is moderately to markedly limited. R. 289. She explained that Fetting has chronic pain and headaches which cause distractibility and memory issues. She noted that Fetting's understanding seems sufficient, but his ability to remember, apply information, and carry out instructions on a consistent, sustained basis is not likely. *Id.* Dr. Frodin also opined that Fetting's ability to respond appropriately to supervisors and co-workers has a marked limitation. R. 290. She reasoned that Fetting is irritable and crabby by his own admission and that appropriate responses on a consistent, sustained basis are quite unlikely. Dr. Frodin stated that Fetting's ability to maintain concentration, attention, and work pace has a marked limitation. She noted that Fetting is easily distracted due to his chronic pain and that his ability to maintain concentration and attention, persist at tasks, and keep up a work pace on a consistent, sustained basis is not likely. Next, Dr. Frodin opined that Fetting's ability to withstand routine work stresses has a moderate to marked limitation. She indicated that Fetting is not handling stress well, he gets frustrated easily, and having a routine improves function. Dr. Frodin opined that Fetting's ability to adapt to changes has a moderate to marked limitation. She noted that changes confuse Fetting and that he gets irritable and mouthy. *Id.*

Dr. Dennison completed an adult mental profile after a consultative examination on August 31, 2016. R. 272–79. Fetting was referred to Dr. Dennison for evaluation for depression and alcohol abuse. R. 277. Dr. Dennison noted that Fetting's history indicates he has difficulty finding and maintaining employment due to his chronic use of alcohol and persistent depression. R. 278. She indicated he should be encouraged to establish a relationship with a sympathetic counselor to work through his emotional issues and cope with his health issues and establish future goals. She also noted that participation in a job retraining program may be helpful. Dr. Dennison opined that

Fetting has an ability to understand, remember, and carry out simple instructions. She indicated that, with the help of a job coach or mentor, Fetting may be able to maintain part-time employment. *Id.* Dr. Dennison stated that Fetting's ability to concentrate, pay attention, and sustain work pace seems hampered by his health issues and chronic years of alcohol use. R. 278–79. She noted that Fetting seems capable of withstanding normal routine work stressors in an environment that is predictable and viewed as supportive. R. 279. Dr. Dennison indicated that Fetting may have difficulties that at times may require him to take breaks to de-stress, which is likely to be a significant problem unless he can learn to sustain effective coping strategies on a consistent basis. She noted that Fetting's ability to adapt to changes seems intact. She recommended medication to treat his depression. R. 279.

The ALJ did not find Dr. Frodin's opinion persuasive because it was not consistent with the overall record. R. 21. He noted that the majority of the assessment is based on Fetting's subjective reports rather than treatment records or clinical findings because Fetting only sought treatment for mental health in February 2019. Based on the limited treatment and Fetting's testimony at the hearing regarding prior work and activities of daily living, the ALJ found that the non-exertional limitations included in the RFC appropriately accommodate Fetting's functional difficulties without being overly restrictive. *Id.*

The ALJ also found that Dr. Dennison's opinion was not persuasive because it was not consistent with the overall record. R. 22. He noted that the majority of the assessment is based on Fetting's subjective reports rather than treatment records or clinical findings. The ALJ stated that Fetting has only recently sought treatment for mental health conditions, and the ALJ found that the non-exertional limitations included in the RFC appropriately accommodate Fetting's functional difficulties without being overly restrictive. *Id.*

The ALJ also considered the December 19, 2019, treatment note from one of Fetting's treatment providers, Dr. Jon Matthew. *Id.* The ALJ noted that, while Dr. Matthew discussed Fetting's physical pain throughout the letter, this is not his area of expertise and he relies on Fetting's subjective reports. The ALJ indicated that, because the letter is not a function-by-function analysis of Fetting's capabilities, he did not find the opinion persuasive. He stated that the limited treatment and Fetting's subjective complaints about mental health symptoms are appropriately accommodated by limiting him to simple and routine tasks, maintaining attention and concentration for two-hour segments, making simple work-related decisions, occasional interaction with supervisors and coworkers, and no interaction with the public. *Id.*

Fetting asserts that the ALJ erred in dismissing the opinions of Dr. Frodin and Dr. Dennison because they relied on his self-reports. Citing *Mischler v. Berryhill*, 766 F. App'x 369 (7th Cir. 2019), Fetting argues that an ALJ cannot reject a mental health provider's opinion on the basis that the opinion is based on the claimant's self-report of symptoms. In *Mischler*, the court explained

> A psychiatrist does not merely transcribe a patient's subjective statements. Mental-health assessments normally are based on what the patient says, but only after the doctor assesses those complaints through the objective lens of her professional expertise. Further, the trained physician, not the ALJ, is better positioned to discern "true" complaints from exaggerated ones.

*Id.* at 375 (internal citations omitted). In this case, there is no indication that Drs. Frodin or Dennison assessed Fetting's complaints or subjective reports "through the objective lens of [their] professional expertise." *Id.* Neither doctor provided a citation to treatment notes that supported their extreme limitations, and Fetting does not point to anything in either Dr. Frodin or Dr. Dennison's report indicating that they used their training or expertise to determine whether Fetting accurately reported his symptoms. It was not improper for the ALJ to reject the opinions because

9

they appeared "to be based on a claimant's exaggerated subjective allegations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); *see also Apke v. Saul*, 817 F. App'x 252, 256–57 (7th Cir. 2020).

The ALJ concluded that both opinions were inconsistent with the overall record. He noted that Fetting received very little treatment for mental health conditions, and in June 2018, his mental status exam showed that he was alert and oriented and cooperative with appropriate mood/affect and normal judgment. R. 19. Fetting asserts that the ALJ violated SSR 16-3p by failing to inquire into the reasons for Fetting's limited treatment. But the ALJ asked Fetting about his limited treatment history at the administrative hearing and referenced Fetting's explanations regarding his treatment in his decision. *See, e.g.*, *id.* ("There are very few medical records because the claimant testified that he does not believe in doctors or taking medication."); R. 21 ("[T]he undersigned notes that the medical records in this case are limited because the claimant does not like doctors."). Fetting also maintains that the ALJ failed to realize that Dr. Frodin's opinion would not be supported by the overall record due to his limited treatment history. Although the ALJ noted Fetting's limited treatment history, he explained that Dr. Frodin's opinions and conclusions were inconsistent with the overall medical record, such as normal findings during mental status exams. The ALJ properly considered Fetting's treatment history in evaluating whether the doctors' opinions were consistent with the evidence in the record.

Fetting maintains that the ALJ failed to consider the consistency of Dr. Frodin's opinion with Dr. Dennison's opinion and Dr. Matthew's December 2019 treatment note. But the ALJ was not required to find the opinions of Dr. Frodin persuasive based on their purported consistency with other opinions that he found were not persuasive, given their inconsistency with the overall

record. The ALJ provided an adequate explanation for his findings. His conclusions were not patently wrong and do not necessitate remand on this basis.

   B. **VE Testimony**

Fetting maintains that the ALJ failed to elicit a reasoned and principled explanation of the VE's job number estimates before relying on the VE's testimony to support the step five denial. At step five of the sequential evaluation process, the Commissioner has the burden of establishing the existence of significant number of jobs in the national economy that a plaintiff can perform. *See* 20 C.F.R. §§ 404.1560(c)(1); 416.960(c)(1). The Seventh Circuit has held that, in assessing a VE's testimony concerning the number of jobs a claimant can perform, "the substantial evidence standard requires the ALJ to ensure that the approximation is the product of a reliable method." *Chavez v. Berryhill*, 895 F.3d 962, 968 (7th Cir. 2018) (citation omitted). Fetting contends that the ALJ failed to ensure that the VE used a reliable method in reaching his job number estimates.

At the administrative hearing, the VE testified that there were jobs in the national economy that someone with Fetting's age, education, work experience, and RFC could perform and listed three categories of jobs: cleaner, housekeeping (200,000 jobs nationally), routing clerk (40,000 jobs nationally), and marker (200,000 jobs nationally). Fetting's attorney asked the VE what the source of the numbers he testified to was. R. 76. The VE responded that his job number estimates were "derived from the U.S. Bureau Labor Statistics figures." *Id.* He explained:

> The Bureau will not provide job numbers on individual DOT occupations. They oftentimes will combine several occupations in a grouping and report numbers on the grouping. My method would be to look at the composition of a group. For instance, the cleaner, housekeeping position is in a group with nine other DOT occupations. I would look at the composition of that nine occupation group.
>
> Based on my knowledge of the labor market, over 30+ years of job placement activities, I would look at that grouping and I would say that grouping and I would say that there are probably three or four jobs that would be found regularly in the labor market and then there's four to five that are very selective in terms of their

11

> prevalence in the labor market. Cleaner, housekeeping position is something that's found at many different industries and that would be one that would, I believe, make up a larger portion of the total group. The Bureau reports that there are 925,000 positions in that grouping. I estimated that of that grouping, 200,000 would be of the cleaning, housekeeping type. So, that's the type of analysis that would go on to provide the job numbers, which are estimates.

R. 76–77.

Plaintiff's counsel asked if there was a formula the VE used to obtain his job number estimates or if it was based on his experience. R. 77. The VE responded:

> It's a simple formula based on the composition of that grouping. It's not a hard and fast scientific type formula. As I indicated, in that grouping, there are jobs that are domestic service like an ironer or a second butler. And, while those may occur in the labor market, my experience would be that they would be very small numbers compared to cleaner, housekeeper or a cleaner in the hospital or a house cleaner in a hotel. Those would certainly have a large majority of the jobs fall in those types of areas. So, it's a rough formula based on the composition of the group.

*Id.* Plaintiff's counsel asked, "So did you kind of divide it up across those ones you thought made up the bulk of it?" R. 77–78. The VE indicated that he did not weigh every job in the grouping but would weigh those jobs that he thought made up the bulk of the group heavier as well. R. 78. When counsel asked if the VE did any analysis to validate whether the numbers have any accuracy with respect to the estimate, the VE stated that, while he did not do any formal analysis in validating, he had in the past. *Id.* He noted that he compared "numbers in other job reporting" and validated the job numbers by trying to find jobs that are commonly found in the labor market, rather than the small niche type positions found in very narrow employments. *Id.* Counsel then stated, "All right, that's all I have." *Id.*

After the VE explained the basis for his testimony, Fetting and his counsel did nothing further. Fetting did not object to the VE's qualifications, methodology, or job number estimates. The Seventh Circuit has repeatedly held that a plaintiff forfeits an objection to a VE's testimony if it is not raised at the hearing. *See Brown v. Colvin*, 845 F.3d 247, 254 (7th Cir. 2016) (noting

12

that plaintiff "forfeited these arguments by failing to object to the testimony during the administrative hearing"); *Coyier v. Saul*, 860 F. App'x 426, 427–28 (7th Cir. 2021) ("[Plaintiff] waived any challenge to the VE's testimony by failing to ask any questions to reveal shortcomings in the job-number estimates . . . . [This] effectively conceded the reliability of the VE's job numbers."); *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) ("Had [Plaintiff] actually objected to the VE's testimony, the VE could have said more . . . . As it stands, however, the VE's testimony was both unobjected to and uncontradicted. Thus the ALJ was entitled to credit the testimony."); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) ("[B]ecause [the claimant's] lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it is forfeited."); *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion."). Fetting had the opportunity to object to the VE's testimony at the administrative hearing or in a post-trial brief but did not do so. Because Fetting did not challenge or object to the VE's testimony or methodology at the hearing, the ALJ was permitted to accept the VE's uncontradicted testimony. Accordingly, Fetting's arguments that the VE failed to support his testimony with substantial evidence and that the ALJ erred in relying on the VE's testimony do not warrant remand.

## CONCLUSION

For these reasons, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 24th day of March, 2022.

s/ William C. Griesbach
William C. Griesbach
United States District Judge